**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Kenneth Djerf, | No. CV-02-0358-PHX-JAT |
| Petitioner, | DEATH PENALTY CASE |
| vs. | |
| Dora B. Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

Richard Kenneth Djerf ("Petitioner") is a state prisoner under sentence of death. Pursuant to the Court's general procedures governing resolution of capital habeas proceedings, the parties have completed briefing of both the procedural status and the merits of Petitioner's habeas claims.

Before the Court is Petitioner's First Amended Petition, which raises twenty claims for habeas relief. (Dkt. 55.)[1] In a previous Order, this Court denied Petitioner's motion for discovery and an evidentiary hearing and denied several claims based on procedural bar. (*See* Dkt. 94.) This Order resolves the remaining claims. The Court concludes that Petitioner is not entitled to habeas relief.

---

[1] "Dkt." refers to the documents in this Court's file.

**FACTUAL AND PROCEDURAL BACKGROUND**

While working at a local supermarket, Petitioner met and became friends with Albert Luna, Jr.[2]  Luna subsequently burglarized Petitioner's apartment, taking his television, a VCR unit, stereo equipment, a car alarm, and an AK-47 assault rifle.  Petitioner suspected Luna and informed police, but Luna was not arrested.  The matter festered for several months until Petitioner, angered by the burglary and frustrated by police inaction, decided to seek revenge.

Late on the morning of September 14, 1993, Petitioner went to the Luna family home armed with a nine-millimeter Beretta handgun, a knife, latex gloves, handcuffs, red fuse cord, and flowers as a ruse to gain entry.  When Luna's mother, Patricia, opened the door to receive the flowers, Petitioner pushed his way into the house, brandishing his gun. While holding Damien, Patricia's five-year-old son, hostage, Petitioner robbed the Luna family by forcing Patricia to put certain household items into the Luna family car.  Afterwards, he took Patricia and Damien into the kitchen and bound them to chairs with rope and black electrical tape.  More than once, he asked Patricia whether she or her son should die first.  He also asked her the whereabouts of Albert Jr.

At around 3:00 p.m., Rochelle, Patricia's eighteen year-old daughter, came home from school. At knifepoint, Petitioner took Rochelle to her bedroom, gagged her with tissue paper and tape, tied her wrists to her bed, cut and removed her clothes with a knife, and raped her. Petitioner killed Rochelle by stabbing her four times in the chest and slitting her throat, severing her jugular vein. Two of the chest wounds and the throat wound were potentially fatal.  Rochelle also suffered multiple shallow knife wounds to the back of her head while she was alive, and one stab wound to her right temple, which may have been postmortem. Her earring had been torn through the earlobe.  At some point while still alive, Rochelle

---

[2]   Except where otherwise indicated, this factual summary is taken from the decision of the Arizona Supreme Court in *State v. Djerf*, 191 Ariz. 583, 959 P.2d 1274 (1998).

vomited behind her gag and choked on her own vomit.  Petitioner left the bedroom and told Patricia he had raped and killed her daughter.

Shortly thereafter, Albert Luna, Sr., arrived home from work.  At gunpoint, Petitioner handcuffed Albert's arms behind his back and forced him into the master bedroom, placing him face down on the bed.  He struck Albert in the back of the head multiple times with an aluminum baseball bat, inflicting lacerations and spattering blood throughout the room.  The hemorrhaging that Albert suffered from these wounds was potentially fatal.  Petitioner removed the handcuffs but taped Albert's hands and wrists together and left him for dead.  Petitioner walked back to the kitchen and told Patricia that he had killed her husband.

Petitioner next attempted to snap Damien's neck by twisting his head abruptly from behind, "like he had seen in the movies."  In fact, Petitioner "turned [Damien's head] all the way around and nothing happened," so he stopped.  Petitioner then attempted to electrocute Damien, cutting an electrical cord from a lamp, stripping its insulation, and taping it to the skin on Damien's calf.  The cord was found unplugged at the scene.

Despite his injuries, Albert was able to free himself from the tape.  He went to the kitchen and charged Petitioner with his pocketknife, seriously wounding him.  However, during the ensuing struggle, Petitioner stabbed Albert and shot him six times, killing him.  Petitioner then asked Patricia, "Do you want to watch your kid die, or do you want your kid to watch you die?" Petitioner then killed both Patricia and Damien, shooting them in the head at close range.  Petitioner's attack on the Luna family lasted for more than six hours.

In an attempt to conceal the murders, Petitioner planned to set the house on fire with red fuse wire.  He splashed gasoline on the bodies and throughout the house and got ready to light the fuse.  He changed his mind when he noticed children playing outside, which meant that he could not leave the house immediately without being seen.  Instead, he turned on two of the kitchen stove burners, placed an empty pizza box and a rag on the burners, and left the house.  Petitioner stole the Luna's car and drove to his apartment.  When his girlfriend, Emily Boswell, arrived, he told her that he had been stabbed by two men trying

1    to rob him.  He was later admitted to the hospital.

2        Albert Jr. did not return to the family home until late that night.  Numerous

3    unanswered calls to his family had made him anxious, so he drove to the home.  When he

4    entered the house and discovered the bodies, he immediately left and contacted police.  When

5    the police arrived, the stove burners were red hot but the pizza box and rag had not ignited.

6        Petitioner admitted to Boswell that he murdered four people in the Luna family and

7    described to her the brutality of the murders.  He told Boswell that the blood dripping from

8    Patricia's gunshot wound was "really awesome" and "you should have been there."

9    Petitioner's friend, Travis Webb, checked him out of the hospital, but Petitioner was

10   unwilling to go back to his own apartment.  Webb rented a motel room for Petitioner.

11   Petitioner contacted a friend, Daniel Greenwood, in California, to whom he again admitted

12   his guilt in the four murders.  Petitioner also told Webb that he committed the four Luna

13   murders.

14       Phoenix police executed search warrants on the motel room, Petitioner's car, and his

15   apartment.  The police found handcuffs, Petitioner's nine-millimeter Beretta handgun,

16   artificial flowers, a vase, and a red fuse cord.  Petitioner also was in possession of the Luna

17   family's personal belongings, including a CD player, two VCR units, a U.S. West caller ID

18   unit, watches, Rochelle's necklace, Patricia's car keys, a telephone, and food stamps.  When

19   they arrested Petitioner that same day, the police also found a handcuff key and a newspaper

20   section containing an article about the killings.

21       Petitioner was indicted for the four murders, burglary, kidnapping, sexual assault,

22   aggravated assault, attempted arson, theft, and misconduct involving weapons.  The trial

23   court appointed two attorneys to represent Petitioner, Michael Vaughn and Alan Simpson.

24   Subsequently, Petitioner filed a motion to change counsel and proceed *pro se* for all future

25   proceedings.  The court held that Petitioner voluntarily, knowingly, and intelligently waived

26   his right to counsel. The trial court granted Petitioner's motion to proceed *pro se* but kept

27   Vaughn and Simpson as advisory counsel.

28

1  The prosecution filed a motion to determine Petitioner's competence to waive counsel

2  and conduct his own defense.  Petitioner consented to such an evaluation to "remove any

3  doubt as to . . . competence."  The trial court ordered a prescreening evaluation to determine

4  whether a complete competency examination was warranted.  Dr. Jack Potts evaluated

5  Petitioner and pronounced him competent.  The trial court reaffirmed its finding that

6  Petitioner be allowed to proceed *pro se*.

7  Petitioner decided to enter into a plea agreement with the State, pleading guilty to four

8  counts of first degree murder.  The agreement expressly stated that no limits would be placed

9  on sentencing and Petitioner could be sentenced to death for any or all of the murder counts.

10  In exchange, the State agreed to dismiss the remaining criminal counts.  At the plea hearing,

11  the trial court informed Petitioner of certain constitutional rights being relinquished under

12  the plea agreement, acknowledged Dr. Potts' prescreening report and reaffirmed the finding

13  of competency, and concluded that Petitioner's guilty pleas were made knowingly,

14  intelligently, and voluntarily.

15  Petitioner subsequently withdrew his waiver of counsel and accepted representation

16  for the remainder of the sentencing proceedings.  Petitioner requested and received the

17  appointment of three mental health experts, a psychologist, a neuropsychologist, and a

18  neurologist.  Ultimately, Petitioner chose not to submit any reports from his mental health

19  experts.  The trial court conducted aggravation and mitigation hearings.  The court then

20  rendered its special verdict, concluding that the prosecution had proven four statutory

21  aggravating circumstances: that the murders were committed for pecuniary gain; that they

22  were committed in an especially heinous, cruel, or depraved manner; that multiple homicides

23  were committed; and that at the time of the offense Petitioner was an adult and one of the

24  victims, Damien Luna, was under fifteen years of age.  The trial court determined that

25  Petitioner failed to prove any statutory mitigating factors or the non-statutory mitigating

26  factors of post-arrest conduct, disadvantaged childhood, psychological disorder, remorse,

27  adjustment to confinement, or acceptance of responsibility.  The court imposed the death

28

1   sentence on each of the homicide counts.  On direct appeal, the Arizona Supreme Court
2   affirmed, *see State v. Djerf*, 191 Ariz. 583, 959 P.2d 1274 (1998), and the United States
3   Supreme Court denied a petition for writ of certiorari.  *Djerf v. Arizona*, 525 U.S. 1024
4   (1998).

5       In 2000, the Arizona Supreme Court issued the mandate in Petitioner's case and
6   appointed post-conviction relief ("PCR") counsel.  (ROA-PCR 1-3.)[3] PCR counsel filed an
7   initial petition.  (ROA-PCR 6.)  Counsel requested and the court granted the appointment of
8   a mental health expert.  (ROA-PCR 9, 11, 13-14.)  Counsel filed an amended PCR petition.
9   (ROA-PCR 19.)  Counsel chose not to include any mental health report in support of the
10  amended petition.  (*Id.*)  After the amended petition was filed, Petitioner's mental health
11  expert conducted additional testing, but the results of such testing were not submitted to the
12  court.  (ROA-PCR 21-22.)  The trial court summarily denied PCR relief.  (ROA-PCR 27.)
13  The Arizona Supreme Court denied a petition for review.  (PR Doc. 6.)  Petitioner then
14  commenced these proceedings.

15      After briefing the procedural status and merits of his habeas claims, Petitioner filed
16  a motion for discovery, an evidentiary hearing and expansion of his state court record.  This
17  Court denied Petitioner's motion, concluded that Claims Three, Twelve, and Twenty were
18  procedurally barred, and dismissed Claim Six as a non-cognizable habeas claim.  (Dkt.94.)
19  The Court now resolves the procedural status and merits of the remaining claims.

20

21

---

22      [3]    "ROA" refers to the four volumes of records from Maricopa County Superior
23  Court, which was prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case
    No. CR-93-07792).  "RT" refers to the reporter's transcripts of Petitioner's trial and
24  sentencing proceedings.  "ME" refers to the minute entries of the trial court.  "ROA-PCR"
    refers to the volume of records from Maricopa County Superior Court, which was prepared
25  for Petitioner's PCR proceedings (Case No. CR-93-07792).  "PR Doc." refers to the volume
26  of records from the Arizona Supreme Court denying Petitioner's Petition for Review
    following denial of PCR relief (Case No. CR 01-0293-PC).  A certified copy of the state
27  court record was provided to this Court by the Arizona Supreme Court on April 2, 2002.
    (*See* Dkt. 17.)
28

1

## PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

2      A writ of habeas corpus may not be granted unless it appears that a petitioner has

3  exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.*

4  *Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly

5  present" the operative facts and the federal legal theory of his claims to the state's highest

6  court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848

7  (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78

8  (1971).  If a habeas claim includes new factual allegations not presented to the state court,

9  it may be considered unexhausted if the new facts "fundamentally alter" the legal claim

10 presented and considered in state court.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

11     Exhaustion requires that a petitioner clearly alert the state court that he is alleging a

12 specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir.

13 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process

14 not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-

15 70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency

16 of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked

17 specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)

18 ("The mere similarity between a claim of state and federal error is insufficient to establish

19 exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing

20 specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases

21 that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153,

22 1158 (9th Cir. 2003) (en banc).

23     In Arizona, there are two primary procedurally appropriate avenues for petitioners to

24 exhaust federal constitutional claims: direct appeal and post-conviction relief (PCR)

25 proceedings.  Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings

26 and provides that a petitioner is precluded from relief on any claim that could have been

27 raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive

28

1   effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions

2   (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was

3   omitted from a prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P.

4   32.1(d)-(h), 32.2(b), 32.4(a).

5       A habeas petitioner's claims may be precluded from federal review in two ways.

6   First, a claim may be procedurally defaulted in federal court if it was actually raised in state

7   court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S.

8   at 729-30.  The procedural bar relied on by the state court must be independent of federal law

9   and adequate to warrant preclusion of federal review.  *See Harris v. Reed*, 489 U.S. 255, 262

10  (1989).  A state procedural default is not independent if, for example, it depends upon a

11  federal constitutional ruling.  *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam).

12  A state bar is not adequate unless it was firmly established and regularly followed at the time

13  of the purported default.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

14      Second, a claim may be procedurally defaulted if the petitioner failed to present it in

15  state court and "the court to which the petitioner would be required to present his claims in

16  order to meet the exhaustion requirement would now find the claims procedurally barred."

17  *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998)

18  (stating that the district court must consider whether the claim could be pursued by any

19  presently available state remedy).  If no remedies are currently available pursuant to Rule 32,

20  the claim is "technically" exhausted but procedurally defaulted.  *Coleman*, 501 U.S. at 732,

21  735 n.1; *see also Gray*, 518 U.S. at 161-62.

22      Because the doctrine of procedural default is based on comity, not jurisdiction, federal

23  courts retain the power to consider the merits of procedurally defaulted claims.  *Reed v. Ross*,

24  468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a

25  procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

26  to properly exhaust the claim in state court and prejudice from the alleged constitutional

27  violation, or shows that a fundamental miscarriage of justice would result if the claim were

28

1   not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

2   Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some

3   objective factor external to the defense impeded counsel's efforts to comply with the State's

4   procedural rule." *Id*. at 753.  Objective factors which constitute cause include interference

5   by officials which makes compliance with the state's procedural rule impracticable, a

6   showing that the factual or legal basis for a claim was not reasonably available, and

7   constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488

8   (1986).  To establish prejudice, a habeas petitioner bears the burden of demonstrating "not

9   merely that the errors at his trial constituted a *possibility* of prejudice, but that they worked

10  to his *actual* and substantial disadvantage, infecting his entire trial with errors of

11  constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

12  ### AEDPA STANDARD FOR RELIEF

13  Petitioner filed his amended petition after the effective date of the Antiterrorism and

14  Effective Death Penalty Act ("AEDPA").  Therefore, the provisions of the AEDPA govern

15  consideration of Petitioner's claims.  The AEDPA established a more rigorous standard for

16  habeas relief. *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (*Miller-El I*).  As the

17  Supreme Court has explained, the AEDPA's "'highly deferential standard for evaluating

18  state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."

19  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521

20  U.S. 320, 333 n.7 (1997).

21  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

22  adjudicated on the merits by the state court unless that adjudication:

23  (1) resulted in a decision that was contrary to, or involved an unreasonable
24  application of, clearly established Federal law, as determined by the Supreme
    Court of the United States; or

25  (2) resulted in a decision that was based on an unreasonable determination of
26  the facts in light of the evidence presented in the State court proceeding.

27  28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

28

1    a party's claim which is based on the substance of the claim rather than on a procedural or

2    other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The

3    relevant state court decision is the last reasoned state decision regarding a claim. *Barker v.*

4    *Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

5    804 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

6            "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

7    of law that was clearly established at the time his state-court conviction became final."

8    *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection

9    (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

10   the sufficiency of the claims on habeas review. "Clearly established" federal law consists

11   of the holdings of the Supreme Court at the time the petitioner's state court conviction

12   became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649,

13   653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be

14   granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional

15   principle advanced by a petitioner, even if lower federal courts have decided the issue.

16   *Williams*, 529 U.S. at 381; *see Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004).

17   Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be

18   "persuasive" in determining what law is clearly established and whether a state court applied

19   that law unreasonably. *Clark*, 331 F.3d at 1069.

20           The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

21   The Court has explained that a state court decision is "contrary to" the Supreme Court's

22   clearly established precedents if the decision applies a rule that contradicts the governing law

23   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

24   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

25   indistinguishable from a decision of the Supreme Court but reaches a different result.

26   *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In

27   characterizing the claims subject to analysis under the "contrary to" prong, the Court has

28

                                                    - 10 -

1  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

2  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

3  clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

4  Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

5  may grant relief where a state court "identifies the correct governing legal rule from [the

6  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

7  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

8  where it should not apply or unreasonably refuses to extend that principle to a new context

9  where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

10  application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

11  must show that the state court's decision was not merely incorrect or erroneous, but

12  "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

13  Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

14  court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

15  *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

16  determination will not be overturned on factual grounds unless objectively unreasonable in

17  light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

18  In considering a challenge under 2254(d)(2), state court factual determinations are presumed

19  to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

20  convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.  However, it

21  is only the state court's factual findings, not its ultimate decision, that are subject to

22  2254(e)(1)'s presumption of correctness.  *Miller-El I,* 537 U.S. at 341-42 ("The clear and

23  convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to

24  state-court determinations of factual issues, rather than decisions.").

25  As the Ninth Circuit has noted, application of the foregoing standards presents

26  difficulties when the state court decided the merits of a claim without providing its rationale.

27  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

28

1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## **DISCUSSION**

### **Claim One**

Petitioner contends that the trial court failed to adequately inquire into the reason he filed a motion to substitute counsel and proceed *pro se* at his trial; consequently, Petitioner argues, he did not make a knowing, intelligent, or voluntary waiver of counsel because the trial court forced him to choose between incompetent counsel and no counsel at all.  (Dkt. 55 at 45.)

Background

Following indictment in September 1993, Petitioner was appointed two counsel, Michael Vaughn and Alan Simpson.  (ME 10/8/93; ROA 6.)  On February 15, 1995, Petitioner filed a *pro se* motion for change of counsel, asking the court to remove Vaughn and Simpson and allow him to proceed *pro se*.  (ROA 117.)  On February 17, during a previously scheduled hearing for pretrial motions, the trial court acknowledged receipt of Petitioner's motion.  (RT 2/17/95; ME 1/13/95.)  The court asked Petitioner if he continued to desire to proceed *pro se*, to which he responded affirmatively.  (RT 2/17/95 at 2.)  Rather than resolve the matter, the court determined that Petitioner should think about his decision for a few days and scheduled a hearing on his motion for February 23.  (*Id.* at 3, 18; ME

2/17/95.) Due to the unresolved motion, however, the court asked Petitioner if he wanted his counsel to litigate the motions for which argument had already been scheduled. (RT 2/17/95 at 6.) Petitioner conferred with his counsel and informed them that he wanted them to argue those motions to the court. (*Id.* at 6-7.) At no time during the hearing did Petitioner express any dissatisfaction with his counsel. (RT 2/17/95.)

Between indictment and the motion to proceed *pro se*, the trial court conducted monthly pretrial conferences, as well as other hearings dealing with pretrial motions. Because the trial court had been monitoring the case on a monthly basis, the court was familiar with the progress of the case and whether counsel was effectively handling Petitioner's defense. During this time period, two firm trial dates had to be continued due to the scheduling of a consolidated DNA hearing before another trial judge. Ten criminal cases, including Petitioner's, had been consolidated for the purposes of hearing expert testimony regarding the DNA evidence that was to be presented in each case.[4]

On February 21, the trial court received a letter from a Petitioner advising the court that he did not believe he was receiving proper representation from counsel because they had not properly or consistently communicated with him about the status of his case. (ROA 122.) In the letter, dated February 14, Petitioner expressed concern about this lack of communication because trial was scheduled for March 1.[5] (*Id.*)

On February 23, the court convened a hearing to resolve Petitioner's motion to proceed *pro se*. (RT 2/23/95.) Prior to asking Petitioner why he had filed the motion, the court inquired whether he had discussed this matter with his counsel. (*Id.* at 4.) Petitioner

---

[4]     Due to the postponement of the consolidated DNA hearing, the trial court did not reestablish a firm trial date for Petitioner's trial until its pretrial hearing on July 12, 1995. The consolidated DNA hearing was held during the months of June and July, 1995.

[5]     Evidently, prior to the writing of this letter, Petitioner had not been advised that his non-firm trial date of March 1 was going to be continued and that a firm trial date for his trial was not going to be established until after the consolidated DNA hearing was concluded.

informed the court that he had "very thoroughly" discussed the matter with counsel. (*Id.*)
Before concluding that Petitioner had knowingly, intelligently, and voluntarily waived his
right to counsel, the court went over in detail the ramifications of his decision. (*Id.* at 18-19.)

In addition, the court inquired about why Petitioner wanted to remove Vaughn and
Simpson and represent himself. (*Id.* at 11.) Petitioner advised the court that he was not
happy with his representation because counsel had not been keeping him advised of what was
happening in his case and that "I just assume that I can do this myself." (*Id.*) The trial court
strongly disagreed that Vaughn and Simpson were not representing him well, noting their
interviews with many witnesses,[6] their work on the consolidated DNA hearing, and their
handling of other experts in fingerprints and handwriting analysis. (*Id.* at 11-12.) Petitioner
indicated that he understood all the work his counsel had put into his case. (*Id.*) Other than
lack of communication, Petitioner did not present any other allegations of ineffectiveness.
(RT 2/17/95; 2/23/95.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that his
waiver of counsel was not intelligent, knowing, and voluntary.

> At the initial hearing on February 23, held on the waiver of counsel
> motion, the trial court fully informed defendant of his right to counsel, the
> minimum, maximum, and presumptive sentences, the dangers of
> self-representation, and the difficulties involved in defending oneself without
> formal legal training. Defendant's attorneys informed the court they did not
> think it was in defendant's best interest that he defend himself, but both
> indicated to the court they believed he was competent to do so. When asked,
> defendant told the trial court his reason for requesting the waiver was that he
> felt there was insufficient communication between himself and his attorneys.
> The trial court explained to defendant that his attorneys had been fully
> engaged, working on his behalf.

*Djerf*, 191 Ariz. at 591, 959 P.2d at 1282.

The Arizona Supreme Court also rejected Petitioner's argument that it was error for
the trial court not to construe his motion as a request for new counsel instead of a motion to

---

[6]     At a subsequent status conference, a record of witness interviews was made
indicating that counsel for Petitioner personally interviewed more than fifty witnesses, with
some witness interviews lasting several days. (RT 9/8/95 at 13-14.)

proceed *pro se*, because he indicated to the trial court that he was dissatisfied with his counsel.

In a supplemental brief, defendant argues that the trial court abused its discretion by granting defendant's request to remove trial counsel and to substitute himself as counsel pro se. He asserts that the trial judge erred by failing to inquire into the reasons defendant wanted his own substitution as counsel and alleges that the court's actions fail the test of *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir.1997) (when deciding motion for change of counsel, reviewing court looks at adequacy of trial court's inquiry, extent of conflict between defendant and counsel, and timeliness of motion). *See also United States v. D'Amore*, 56 F.3d 1202, 1204-05 (9th Cir.1995). In support, defendant refers to a letter he wrote to the judge dated February 14, 1995, describing dissatisfaction with what he perceived as a lack of communication between himself and trial counsel. Because the letter preceded his February 15 motion to "substitute himself" as counsel, defendant argues, the trial judge should have known that defendant "was really seeking the representation of counsel who would communicate with him."

Although not expressly stated in his supplemental brief, defendant apparently wishes now to treat the motion at issue as one to change counsel, rather than to waive counsel and substitute self. The impetus for his characterization seems to be (1) the aforementioned letter and (2) the title of the form upon which he asked to represent himself. The motion was titled "CHANGE OF COUNSEL" and stated:

I, RICHARD K. DJERF, hereby request that MICHEAL [sic] VAUGHN/ALAN SIMPSON be withdrawn as my counsel of record, and that RICHARD K. DJERF be substituted as my attorney in all future proceedings in the trial court.

Defendant's later characterization of the motion as one to obtain new counsel is contradicted by the record. In his letter of February 14, defendant enumerated his complaints about counsel, but never once suggested that he wanted new counsel appointed. At a hearing on February 17, the trial judge (who had not yet received the letter but did have the motion) stated that what he had before him was "basically" a motion for self-representation by defendant and asked defendant if he still desired to represent himself. Defendant replied in the affirmative, and the trial judge scheduled the February 23 hearing. (The trial court did not receive defendant's letter until February 21.) At the February 23 hearing, the court treated the motion as stated on its face, to proceed *pro se*, and neither defendant nor his attorneys objected to this or gave any sign that this was not consistent with defendant's intent. Defendant never characterized his request as one for new counsel, not in his letter nor at the hearing nor at any time prior to his supplemental brief in this court. He requested only that he be allowed to represent himself. Further, in a later motion, defendant himself characterized his February 15 motion as a request to proceed *pro se*.[FN4]

FN4. "Because the defendant was constantly being put aside by his court appointed attorneys, the defendant decided to represent himself. On February 15 the defendant, requesting to represent himself, filed his motion. The

1    defendant figured that the only way to eliminate these problems was to defend
2    himself."  Defendant's Motion for Change of Counsel, Sept. 6, 1995.

3         Because defendant had an absolute constitutional right to act *pro se*, the
     trial court correctly determined that defendant was competent and that the
4    waiver of counsel was made voluntarily, knowingly, and intelligently.
     Defendant's argument is meritless, and *Gonzalez*, which describes the test for
5    whether a trial court has abused its discretion in denying a motion to change
     counsel, is inapplicable.

6    *Djerf*, 191 Ariz. at 592-93, 959 P.2d at 1283-84.

7    <u>Analysis</u>

8         A defendant has a constitutional right to represent himself. *Faretta v. California*, 422

9    U.S. 806, 836 (1975).  However, before a defendant may waive counsel, the court must

10   ensure that his waiver is made knowingly, intelligently, and voluntarily.  *See Edwards v.*

11   *Arizona*, 451 U.S. 477, 482 (1981). Petitioner contends that he was forced to choose between

12   incompetent counsel and proceeding *pro se* and therefore his waiver of counsel was not

13   knowing, intelligent, and voluntary.  (Dkt. 55 at 46.)

14        Under the Sixth Amendment, the main purpose of providing assistance of counsel is

15   to ensure that criminal defendants receive a fair trial. *See Strickland v. Washington*, 466 U.S.

16   668, 689 (1984).  In evaluating Sixth Amendment claims, the appropriate inquiry is on the

17   adversarial process, not on the defendant's relationship with his lawyer.  *See United States*

18   *v. Cronic*, 466 U.S. 648, 657 (1984).  Thus, in *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983),

19   the Court held that the Sixth Amendment requires only competent representation and does

20   not guarantee a meaningful relationship between the defendant and counsel.

21        Petitioner has cited no Supreme Court case – and this Court is not aware of any – that

22   stands for the proposition that the Sixth Amendment is violated when a defendant is

23   represented by two lawyers free of any actual conflicts of interest, but who the defendant

24   maintains are not communicating with him on a regular basis.  *See Plumlee v. Masto*, 512

25   F.3d 1204, 1211 (9th Cir. 2008) (en banc) (applying the AEDPA and denying habeas relief

26   in the absence of controlling Supreme Court precedent regarding petitioner's motion to

27   change counsel due to dislike and distrust of his lawyer).  Absent an affirmative obligation

28

imposed on the states by a holding of the United States Supreme Court, the trial court did not err in accepting Petitioner's waiver of counsel and allowing him to proceed with self-representation.

Petitioner further contends his waiver of counsel was not knowing, intelligent, and voluntary because counsels' lack of communication with him violated *Strickland* and he cannot be forced to choose between proceeding with ineffective counsel or proceeding *pro se*. (Dkt. 55 at 46.) The Arizona Supreme Court's finding that Petitioner unequivocally desired to proceed *pro se* and did not desire substitute counsel is supported by the state court record; it was not an unreasonable determination of the facts. *See* 28 U.S.C. § 2254 (d)(2). Based upon these facts, this case is controlled by *Faretta* and *Edwards*, not *Strickland*. In neither *Faretta* nor *Edwards* did the Supreme Court ever require or indicate that before a trial court may accept a waiver of counsel from a criminal defendant desiring to proceed *pro se*, it must initiate or conduct an inquiry sufficient to determine whether defendant is alleging that he is being forced to choose between incompetent counsel and proceeding *pro se*. *Cf. Cook v. Schriro*, No. 06-99005, 2008 WL 3484870 (9th Cir. Aug. 14, 2008) (applying the AEDPA and noting that the Supreme Court has never held that a trial court has a duty to inquire into a defendant's relationship with counsel when he invokes his constitutional right of self-representation). Rather, *Faretta* and *Edwards* only require that the trial court initiate a probing and thorough colloquy with the defendant regarding his right to counsel, the dangers of self-representation, and the difficulties in representing oneself, so that the defendant is aware of the potential consequences of his decision and his choice to waive counsel is "made with eyes wide open." *Faretta*, 422 U.S. at 835 (additional quotation omitted). Petitioner does not challenge the sufficiency of the trial court's *Faretta/Edwards* colloquy.

Even if the Supreme Court had mandated a type of trial court inquiry when a defendant alleges that he is proceeding *pro se* due to allegations of incompetent counsel, Petitioner never attempted to allege how his counsel were performing ineffectively, other

1  than to complain that they were not communicating with him on a consistent basis. Contrary

2  to Petitioner's allegations of ineffective performance, the factual record and the comments

3  from the trial judge demonstrate that Petitioner's counsel were diligently preparing for his

4  trial. (RT 2/17/95; RT 2/23/95.)

5      Moreover, a lack of communication between counsel and a criminal defendant,

6  without more, is generally insufficient to constitute ineffective assistance of counsel. *See*

7  *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *see also United States v.*

8  *Ceballos*, 302 F.3d 679, 696 (7th Cir. 2002). The record in this case does not show that a

9  total lack of communication or a complete breakdown of the attorney/client relationship

10 occurred. *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc). Even if such

11 a breakdown had occurred, Petitioner does not attempt to demonstrate that how his case was

12 prejudiced by any perceived lack of communication. *Id.* at 1028. For the reasons discussed

13 above, Petitioner is not entitled to relief on Claim One.

14     **Claim Two**

15     Petitioner contends that his guilty plea was not knowing, intelligent, and voluntary

16 because the trial court did not adequately inform him that by pleading guilty, he was

17 forfeiting his right to proceed to trial represented by competent counsel. (Dkt. 55 at 51-52.)

18 Petitioner contends that the trial court only informed him that he could proceed *pro se* or be

19 represented by Vaughn and Simpson, whom Petitioner contends were incompetent.[7] (*Id.*)

20 Respondents counter that Claim Two was not presented to the state court and that it is now

21

22     [7]    Petitioner also argues that the Arizona Supreme Court *sua sponte* exhausted
this claim because in its appellate opinion the court indicated that it reviewed the guilty plea
23 colloquy and found it constitutional. (Dkt. 72 at 29-30, citing *Djerf*, 191 Ariz. at 594, 959
P.2d at 1285.) The Arizona Supreme Court's review of a guilty plea colloquy does not
24 exhaust arguments that were not specifically presented to it. *See Moormann v. Schriro*, 426
F.3d 1044, 1057 (9th Cir. 2005) (stating that independent sentencing review does not exhaust
25 issues not included in the scope of review of the death sentence, including unpresented
claims regarding constitutional attacks upon Arizona's death penalty); *Beaty v. Stewart*, 303
26 F.3d 975, 987 (9th Cir. 2002) ("Arizona's fundamental error review does not excuse a
27 petitioner's failure to raise his claims with the Arizona Supreme Court.")

28

technically exhausted and procedurally defaulted. (Dkt. 66 at 20-21.) Petitioner responds that even if he did not exhaust Claim Two, it may not be found technically exhausted and procedurally defaulted because he can file a successive PCR and have the claim reviewed on the merits as a claim of sufficient constitutional magnitude since it involves waiving his right to trial. *See Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002). (Dkt. 72 at 30-31.)

The Court agrees with Respondents that Petitioner did not exhaust Claim Two in state court. (*See* Opening Br. at 25-28.) In his opening brief, Petitioner argued that during the guilty plea colloquy, he had a constitutional right to be advised by the trial court that capital sentencing proceedings were similar to a trial and that despite his guilty plea, he would be not be free from trial-like proceedings at sentencing. (*Id.*) Thus, Petitioner did not present Claim Two on direct appeal.

If Petitioner were to return to state court now and attempt to litigate Claim Two, the PCR court would not reach the merits because the claim is untimely under Rule 32.4(a) of the Arizona Rules of Criminal Procedure and does not fall within an exception to preclusion. Arizona restricts the filing of a successive PCR to certain exceptional claims. *See* Ariz. R. Crim. P. 32.2(b). These exceptions include claims based on newly discovered evidence, a significant change in the law, and actual innocence of the crime or of the death penalty. To commence a successive PCR proceeding, a petitioner files a successive notice of post-conviction relief in the PCR court. In the successive notice, the petitioner indicates the type of exceptional claim being raised and the meritorious reasons entitling the claim to go forward. If a petitioner's notice does not meet these requirements, the PCR court is required to summarily dismiss the notice, without preparation of a petition. *See* Ariz. R. Crim. P. 32.2(b); *State v. Rosales*, 205 Ariz. 86, 90, 66 P.3d 1263, 1267 (App. 2003) (If "a trial court is presented with a successive notice of post-conviction relief in which no claims under Rule 32.1(d) through (h) are articulated, supported by facts, and excused for being tardily raised, the court could dismiss the entire proceeding on the notice, implicitly finding that all

potential claims are precluded by being waived in the previous proceeding. Such a ruling would necessarily include potential claims under Rule 32.1(a) through (c), for which no exception to the preclusion or timeliness rules exists."). Thus, if Petitioner filed an untimely successive PCR, he could only raise claims pursuant to Rule 32.1(d)-(h). Claim Two does not fall within an exception to preclusion under 32.2(b).

Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *See Coleman*, 501 U.S. at 732, 735 n.1. Accordingly, Claim Two will not be considered on the merits absent a showing of cause and prejudice or fundamental miscarriage of justice. Petitioner does not present any arguments in favor of cause and prejudice or a fundamental miscarriage of justice. Claim Two is therefore denied.

**Claim Four**

Petitioner argues that trial counsel rendered ineffective assistance of counsel ("IAC") at sentencing by failing to investigate and present adequate mitigation evidence regarding his dysfunctional family background and mental health. (Dkt. 55 at 55-63.) Specifically, Petitioner asserts that trial counsel failed to argue that he suffers from schizophrenia. (*Id.*)

Background

On August 16, 1995, Petitioner pleaded guilty to four counts of first degree murder. Subsequently, Petitioner decided to discontinue proceeding *pro se* and moved to have counsel represent him at sentencing. (ROA 203.) On October 5, 1995, the trial court granted Petitioner's motion, appointing former advisory counsel Vaughn and Simpson to represent him at sentencing. (ROA 209.)

*Dysfunctional family*

The trial court held a mitigation hearing in February 1996, at which Petitioner's investigator, Art Hanratty, testified. (RT 2/9/96.) Hanratty relayed mitigation information he had obtained from Petitioner's father, mother, and sister. (*Id.*) He testified that Petitioner's parents divorced when he was young and that he was mostly raised by his father,

1   who was in the Navy. (*Id.* at 44-45, 71.) Although Petitioner's father worked two jobs to

2   support the family financially, he did not offer much emotional support for Petitioner by way

3   of hugging or touching or words of encouragement. (*Id.* at 46, 62, 71.) Petitioner's father

4   drank beer, and had alcoholic episodes where he was passed out inside his home. (*Id.* at 60-

5   61.) Petitioner's father never physically abused him; he only yelled and hollered to get his

6   point across. (*Id.* at 54-55.) They did not have family dinners and Petitioner usually ate in

7   his room while watching television. (*Id.* at 59.) When Petitioner started high school, his

8   father did not like some of Petitioner's friends, so he did not allow him to bring them to the

9   house. (*Id.* at 58.) As a result, Petitioner started leaving the home on weekends; however,

10  the father did not check up on him to make sure he was all right. (*Id.*)

11       Hanratty further testified that Petitioner's mother had informed him that Petitioner

12  suffered a closed head injury when he was a toddler. (RT 2/9/96 at 53-54.) Petitioner did

13  not lose consciousness, but he had a large bump on his forehead, which did not require

14  medical attention. (*Id.* at 54.) Petitioner reinjured this area of his head a number of times as

15  a toddler. (*Id.*)

16       While Petitioner's father was away at sea, Petitioner's mother became pregnant,

17  resulting in a child being born out-of-wedlock. (*Id.* at 44.) This led to the dissolution of the

18  marriage. (*Id.*) Petitioner's mother described his father as an alcoholic. (*Id.* at 49.) After

19  the divorce, Petitioner's mother remarried. (*Id.* at 45.) Petitioner's step-father did not like

20  having children in his home, so Petitioner came to live with his father. (*Id.*) Once when

21  Petitioner was visiting his mother, his step-father slammed him against the wall. (*Id.* at 53.)

22  Petitioner's mother never physically abused him; she only yelled and hollered while

23  disciplining the children. (*Id.* at 52.) Because the step-father did not like children, when

24  Petitioner visited his mother on summer vacation, he spent his time fishing and riding horses,

25  mostly alone. (*Id.* at 50-51.)

26       Hanratty testified that Petitioner's sister, who is two years younger, often saw her

27  father passed out drunk on the couch. (*Id.* at 43, 61.) Petitioner's sister indicated that she

28

1    loved her dad and described him as a good loving father.  (*Id.* at 71.)

2        *Mental health*

3        Counsel sought and obtained authorization for the appointment of three mental health

4    experts, Dr. Mickey McMahon, a psychologist, Dr. Marc Walter, a neuorpsychologist, and

5    Dr. Drake Duane, a neurologist.  In January 1996, Dr. McMahon prepared an initial report

6    suggesting that Petitioner undergo neuropsychological testing.  (ROA 253.)  Accordingly,

7    Dr. Walter performed such testing and prepared a report suggesting that Petitioner may have

8    "focal cerebral deficit."  (ROA 260.)  Dr. Walter recommended further testing by a

9    neurologist.  (*Id.*)

10       In March 1996, Petitioner was examined by Dr. Duane.  (RT 3/12/96; ROA 262; RT

11   4/9/96.)  In his interview notes, Dr. Duane specifically noted the report of a closed head

12   injury occurring while Petitioner was a toddler.  (ROA-PCR, Am.Pet., Ex. D.)  Dr. Duane

13   performed routine EEG testing and advanced brain-mapping testing upon Petitioner.  (*Id.*)

14   Dr. Duane's findings were forwarded to Dr. McMahon, but not to the prosecution or the

15   court.  (RT 4/9/96.)  Dr. Duane concluded that Petitioner's testing indicated a personality

16   disorder, not brain dysfunction as Dr. Walter had theorized.  (ROA-PCR, Am.Pet., Ex. D.)

17       Dr. McMahon was responsible for compiling the results of testing obtained by all

18   three mental health professionals.  (RT 3/12/96 at 13-15.)  The court set April 22, 1996, as

19   the deadline for submission of his final report.  (RT 4/9/96 at 5.)  On April 19, 1996, Dr.

20   McMahon compiled the mental health reports and faxed trial counsel his conclusion that

21   Petitioner suffered from an antisocial personality disorder.  (ROA-PCR, Am.Pet., Ex. D.)

22   Dr. McMahon specifically rejected a diagnosis of schizophrenia and rejected any diagnosis

23   that Petitioner suffered from any mental health issue that precluded his ability to appreciate

24   the wrongfulness of his behavior or resulted in an inability to conform his behavior to the

25   requirement of the law.  (*Id.*)  On April 23, 1996, trial counsel notified the court they would

26   not be utilizing either Dr. McMahon's report or his testimony at sentencing.  (RT 4/23/96 at

27   2.)  Trial counsel requested and the court established a deadline for Dr. Walter to submit a

28

final report.  (*Id.* at 5.)  However, there is no record of Dr. Walter completing and submitting such a report.

*PCR proceedings*

Petitioner presented Claim Four during his PCR proceedings.  (ROA-PCR, Am. Pet. at 14-15.)  Prior to filing his amended PCR petition, Petitioner sought and obtained appointment of a mental health expert, Dr. Richard Samuels.  On two occasions, the PCR court granted contact visits for Dr. Samuels to perform mental health testing upon Petitioner. (ROA-PCR, Orders, 9/11/00 & 12/8/00.)  Even though Dr. Samuels conducted a neuropsychological examination of Petitioner, PCR counsel did not submit any expert report in support of Claim Four.

Ultimately, the PCR court concluded that Petitioner had not established a colorable IAC claim and summarily dismissed the claim without granting an evidentiary hearing. (ROA-PCR, Order, 6/14/01.)  The court explained:

> The only evidence defendant presents to support this claim are psychiatric and psychological evaluations of defendant done either before the entry of the plea or before sentencing.  Based on these numerous reports, which were available and considered by the court prior to sentencing, defendant simply speculates that there might be other mitigating information that should have been presented.  This showing does not constitute a colorable claim for relief.

(*Id.*)  Regarding the allegation that trial counsel failed to conduct an adequate social and family history investigation, the PCR court stated that "[Petitioner] has failed to present any evidence to support this claim; instead, he simply speculates that if his childhood was investigated, some mitigating evidence might have been discovered."  (*Id.*)

<u>Analysis</u>

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d 1373, 1378 (9th Cir. 1995)).  To prevail on an IAC claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *Strickland*, 466 U.S. at 687.  The performance inquiry asks whether counsel's assistance was reasonable considering

all the circumstances. *Id.* at 688. Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). A reasonable mitigation investigation must involve not only the search for good character evidence but also evidence that may demonstrate that the criminal act was attributable to a disadvantaged background or to emotional and mental problems. *Boyde v. California*, 494 U.S. 370, 382 (1990).

With respect to prejudice, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

*Dysfunctional family evidence*

In contrast to the performance of trial counsel in the recent Supreme Court cases of *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362 (2000), Petitioner's counsel investigated and presented testimony describing Petitioner's dysfunctional childhood. (RT 2/9/96.) As described above, counsel offered a detailed picture of Petitioner's family background during sentencing. (*Id.*) Again in contrast to *Rompilla*, *Wiggins*, and *Williams*, in Petitioner's case there is no compelling dysfunctional family evidence that was not presented and considered at sentencing. For instance, in the litigation of this claim during the PCR proceedings, Petitioner did not present any additional childhood background evidence in support of his claim that counsel's investigation and presentation at sentencing was deficient. (*See* ROA-PCR, Order, 6/14/01.) The PCR court's decision that counsel did not render deficient performance at sentencing in their investigation and presentation of dysfunctional family evidence was not contrary to or an unreasonable application of controlling Supreme Court

1   precedent.

2          This Court has already denied further evidentiary development of this claim to allow

3   new declarations from Petitioner's mother and sister because Petitioner was not diligent in

4   presenting these current declarations to the state court.  (*See* Dkt. 94 at 20-24, citing 28

5   U.S.C. § 2254(e)(2).)  However, even were this Court to consider the current declarations,

6   the information is cumulative to what the trial court already considered and would not have

7   made a difference in the court's decision to sentence Petitioner to death.  *See Wiggins*, 539

8   U.S. at 536 (stating that the habeas court reweighs the evidence in aggravation against the

9   totality of available mitigating evidence, which includes that adduced at trial, and the

10  evidence adduced in the habeas proceeding).  For instance, in her declaration Petitioner's

11  mother merely discusses her prior marriages, her current marriage, the alcoholism of

12  Petitioner's father, and the fact that his alcoholism hurt the family.  (Dkt. 78, Ex. 4.)

13  However, this information had already been presented at sentencing, even if not quite as

14  comprehensively.   Petitioner's sister adds that their father did administer corporal

15  punishment upon Petitioner, but does not allege that such punishment was excessive.  (Dkt.

16  79 at 3.)  While spanking may be different from hollering and yelling, she never contends

17  that Petitioner's father was physically abusive.  (*Id.*)

18          *Mental health evidence*

19          Petitioner further contends that trial counsel failed to adequately investigate and

20  present mental health evidence at sentencing because the mental health experts counsel

21  utilized overlooked the possibility that Petitioner suffered from schizophrenia.  (Dkt. 55 at

22  63, dkt. 72 at 35.)

23          The Court disagrees that trial counsel's mental health experts did not consider the

24  possibility that Petitioner was schizophrenic.   Rather, at sentencing, Dr. McMahon

25  considered but rejected a diagnosis of schizophrenia.  (*See* ROA-PCR, Am.Pet., Ex. D.)  As

26  already detailed, in order to properly investigate and present mental health mitigation

27  evidence at sentencing, trial counsel obtained evaluations from three mental health experts,

28

a psychologist, a neuropsychologist, and a neurologist.  Petitioner's psychologist, Dr. McMahon, was given the responsibility of compiling the results of mental health testing obtained by all three professionals.  (RT 3/12/96 at 13-15.)  Dr. McMahon compiled the reports and informed trial counsel of his conclusion that Petitioner suffered from an antisocial personality disorder.  (ROA-PCR, Am.Pet., Ex. D.)  Dr. McMahon rejected a diagnosis of schizophrenia and rejected any diagnosis that Petitioner suffered from any mental health issue that precluded his ability to appreciate the wrongfulness of his behavior or resulted in an inability to conform his conduct to the requirement of the law.  (*Id.*)

The Court concludes that trial counsel did not perform deficiently in investigating and evaluating Petitioner's mental health prior to sentencing.  The record shows that trial counsel, based on the conclusions of the defense experts, considered but rejected the possibility that Petitioner suffered from schizophrenia.  (ROA-PCR, Am.Pet., Ex. D.)  Dr. McMahon was also briefed by trial counsel and investigator Hanratty regarding Hanratty's investigation of Petitioner's dysfunctional childhood background.  (*Id.*)  The PCR court's conclusion that trial counsel did not perform deficiently in their investigation of Petitioner's mental health at sentencing is not contrary to or an unreasonable application of Supreme Court precedent.  Absent deficient performance, there is no need to evaluate prejudice.  *Strickland*, 466 U.S. at 687.  Petitioner is not entitled to relief on Claim Four.

**Claim Five**

Petitioner presents three separate allegations of IAC during the direct appeal proceedings.  (Dkt. 55 at 64-67.)

**Subclaim 1**

Petitioner contends that appellate counsel should have expressly challenged whether Petitioner's waiver of counsel was voluntary.  (*Id.* at 65-66.)  This allegation is exhausted as having been specifically considered on direct appeal.  *Djerf*, 191 Ariz. at 592, n.1, 959 P.2d at 1283, n.1.  On habeas review, the Court concludes it is meritless.

The Fourteenth Amendment guarantees a criminal defendant the right to effective

assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). A claim of ineffective assistance of appellate counsel is reviewed according to the standard set out in *Strickland. See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see also Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

Although Petitioner may be technically correct that appellate counsel did not properly argue that his waiver of counsel was involuntary, the issue was *sua sponte* addressed and resolved by the Arizona Supreme Court:

> Although the argument heading in defendant's brief states that defendant's waiver of counsel was not knowing or voluntary, the entire textual analysis goes to the knowing and intelligent factor. The U.S. Supreme Court, in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1980), held that voluntariness and intelligence/knowledge are two separate inquiries. *The record, as described, is uncontrovertible. Defendant's waiver was clearly voluntary.*

*Djerf*, 191 Ariz. at 592, n.1, 959 P.2d at 1283, n.1 (emphasis added).

Based on this holding, the Court need not evaluate whether appellate counsel engaged in deficient performance because Petitioner cannot establish prejudice. *See Smith*, 528 U.S. at 285-86 (stating that petitioner must establish a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal). The Arizona Supreme Court held that Petitioner's waiver of counsel was voluntary. Therefore, Petitioner would not have prevailed even if appellate counsel had specifically argued that the waiver was not voluntary. Furthermore, counsel's performance cannot be deemed ineffective based on a failure to raise a futile issue. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). Subclaim 1 is denied.

**Subclaim 2**

Petitioner contends that appellate counsel performed ineffectively by failing to

1  challenge the trial court's error at his change of plea hearing when the court failed to advise

2  him that he had the constitutional right to proceed to trial with competent counsel. (Dkt. 55

3  at 66-67.) Respondents contend that the claim is procedurally defaulted. (Dkt. 66 at 29.)

4      Petitioner did not present this allegation during the PCR proceedings. (*See* ROA-PCR

5  19 at 12; ROA-PCR 27.) If Petitioner were to return to state court now and attempt to litigate

6  the issue, the claim would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a)

7  of the Arizona Rules of Criminal Procedure because it does not fall within an exception to

8  preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h); *see also supra* Claim Two. Therefore,

9  this subclaim is "technically" exhausted but procedurally defaulted because Petitioner no

10 longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1.[8]  Accordingly,

11 subclaim 2 will not be considered on the merits absent a showing of cause and prejudice or

12 fundamental miscarriage of justice.

13     Petitioner argues that ineffective assistance of PCR counsel constitutes cause to

14 excuse the procedural default. (Dkt. 72 at 37-38.)  Ineffective assistance of counsel can

15 excuse a procedural default only when it rises to the level of an independent constitutional

16 violation. *Coleman*, 501 U.S. at 755.  When a petitioner has no constitutional right to

17

18     [8]     To the extent the Court concludes in this Order that Petitioner does not have
19 an available remedy in state court, because claims or portions of claims would be precluded
   as waived pursuant to Rule 32.2(a)(3), Petitioner does not assert that any exceptions to
20 preclusion are applicable. *See Beaty v. Stewart*, 303 F.3d 975, 987 &  n.5 (9th Cir. 2002)
21 (finding no state court remedies and noting that petitioner did not raise any exceptions to
   Rule 32.2(a)).  The Court finds that none of the preclusion exceptions enumerated in Rule
22 32.2(b)(2) is applicable.  Furthermore, Petitioner does not argue that any of the claims are
   of the type that cannot be waived absent a personal knowing, voluntary and intelligent
23 waiver, *cf. Cassett v. Stewart*, 406 F.3d 614, 622-23 (9th Cir. 2005) (addressing waiver
24 because raised by petitioner), and the Court concludes, as to all of the claims in this Order
   for which the Court determines there is no available remedy in state court pursuant to Rule
25 32.2(a)(3), that none of the claims fall within the limited framework of claims requiring a
26 knowing, voluntary and intelligent waiver. *See* Ariz. R. Crim. P. 32.2(a)(3) cmt. (West 2004)
   (noting that most claims of trial error do not require a personal waiver); *Stewart v. Smith*, 202
27 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002); *see also State v. Espinosa*, 200 Ariz. 503, 505,
   29 P.3d 278, 280 (Ct. App. 2001).
28

counsel, there can be no constitutional violation arising out of ineffectiveness of counsel. *Id.* at 752. There is no constitutional right to counsel in state PCR proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989) (the Constitution does not require states to provide counsel in PCR proceedings even when the putative petitioners are facing the death penalty); *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993) (refusing to extend the right of effective assistance of counsel to state collateral proceedings).

The Ninth Circuit has considered and rejected the argument that cause exists to overcome a procedural default where PCR counsel failed to assert a claim during PCR proceedings. *See Ortiz*, 149 F.3d at 932; *Nevius v. Sumner*, 105 F.3d 453, 460 (9th Cir. 1996); *Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996); *Bonin v. Calderon*, 77 F.3d 1155, 1158-59 (9th Cir. 1996)). Because Petitioner has not established cause to overcome the default, the Court need not analyze prejudice. *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998). Petitioner does not allege a fundamental miscarriage of justice. Therefore, subclaim 2 is denied.

**Subclaim 3**

Petitioner alleges that appellate counsel's performance was ineffective because she failed to raise any challenges to the constitutionality of Arizona's death penalty scheme. (Dkt. 55 at 67.) Respondents contend that the claim is procedurally defaulted. (Dkt. 66 at 29.) Petitioner counters that he exhausted the claim in his petition for review following denial of PCR relief. (Dkt. 72 at 38-39.)

Background

During PCR proceedings, Petitioner raised a number of substantive challenges to the constitutionality of Arizona's death penalty statute. (ROA-PCR 19 at 27-33.) However, Petitioner did not also raise an IAC of appellate counsel claim contending that counsel should have raised these death penalty challenges on appeal. The PCR court found Petitioner's substantive death penalty challenges precluded as waived pursuant to Ariz. R. Crim. P.

1    32.2(a)(3) because Petitioner should have presented these issues on direct appeal.  (ROA-
2    PCR 27.)

3         In the introductory section of his petition for review, Petitioner, for the first time,
4    changed the nature of the claim and asserted that appellate counsel had been ineffective for
5    failing to raise these substantive death penalty challenges on direct appeal.  (PR Doc. 1 at 2.)
6    In the argument section of his petition for review, Petitioner did not continue to allege IAC
7    of appellate counsel, but reverted back to substantively challenging the constitutionality of
8    Arizona's death penalty statute.  (*Id.* at 18-20.)  The Arizona Supreme Court denied review.
9    (PR Doc. 6.)

10        Analysis

11        To exhaust state remedies, a petitioner must "fairly present" the operative facts and
12   the federal legal theory of his claims to the state's highest court in a procedurally appropriate
13   manner.  *O'Sullivan*, 526 U.S. at 848.  Under the Arizona Rules of Criminal Procedure, Rule
14   32.9(c)(1) requires that in the petition for review, the defendant must specify the issues that
15   were decided by the PCR court and those issues which defendant wishes to present to the
16   appellate court for review.  Petitioner did not comply with Rule 32.9(c)(1).  He did not
17   acknowledge to the Arizona Supreme Court that he had not presented, and the PCR court had
18   not resolved, the claim that appellate counsel was ineffective for failing to argue that
19   Arizona's death penalty was unconstitutional.  (PR Doc. 1.)  Compliance with the rule is
20   required to properly exhaust the claim to the Arizona Supreme Court in a procedurally
21   appropriate manner.  *O'Sullivan*, 526 U.S. at 848.  Therefore, subclaim 3 is unexhausted.

22        If Petitioner were to return to state court now and attempt to exhaust this claim, the
23   claim would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the
24   Arizona Rules of Criminal Procedure because it does not fall within an exception to
25   preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h); *see also supra* Claim Two.  Therefore,
26   this subclaim is "technically" exhausted but procedurally defaulted because Petitioner no
27   longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  Petitioner does not

28

attempt to show cause and prejudice or a fundamental miscarriage of justice.  Therefore, subclaim 3 is denied.

**Claim Seven**

Petitioner contends that his constitutional rights were violated by the cumulative effect of trial counsel's deficient performance or by the cumulative effect of trial, appellate and PCR counsel's deficient performance.  (Dkt. 55 at 82.)  Petitioner concedes that this claim was not presented to the Arizona Supreme Court but argues, citing 28 U.S.C. § 2254(b)(1)(B)(i), that the claim should be reviewed on the merits because there is no available state corrective process.[9]   According to Petitioner, there is no available state corrective process because he could not have raised a claim of ineffective PCR counsel until a successive PCR and the Arizona Supreme Court has already rejected the argument that a capital defendant is entitled to effective assistance during PCR proceedings.  (Dkt. 72 at 46-47.)

Section 2254(b)(1)(B)(i) applies "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (per curiam).  The Court concludes that Arizona's Rule 32 provides sufficient opportunity to adjudicate a prisoner's ineffective assistance of counsel claims.  The fact that counsel in this case did not raise all of Petitioner's constitutional claims does not render the state's collateral review process unavailable or ineffective.

---

[9]Title 28 U.S.C. § 2254 provides in pertinent part:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
    (A) the applicant has exhausted the remedies available in the courts of the State; or
    (B)(i) there is an absence of available State corrective process; or
    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

1      If Petitioner were to return to state court now and attempt to litigate this claim, it

2  would be found waived and/or untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona

3  Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See*

4  Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, Petitioner's cumulative error claim is

5  "technically" exhausted but procedurally defaulted because Petitioner no longer has an

6  available state remedy. *See Coleman*, 501 U.S. at 732, 735 n.1; *Beaty v. Stewart*, 303 F.3d

7  975, 987 (9th Cir. 2002). The claim will not be considered on the merits absent a showing

8  of cause and prejudice or a fundamental miscarriage of justice. Petitioner does not raise any

9  cause and prejudice or fundamental miscarriage of justice argument. Therefore, Claim Seven

10  is denied.

11     **Claim Eight**

12      Petitioner contends that the trial court erred when it concluded that the aggravating

13  factors outweighed the mitigating factors and imposed the death penalty. (Dkt. 55 at 83.)

14  Regardless of whether this claim is exhausted, it is meritless. *See* 28 U.S.C. § 2254(b)(2)

15  (allowing the denial of an unexhausted claim on the merits); *Rhines v. Weber*, 544 U.S. 269,

16  277 (2005).

17      The Constitution does not require that a capital sentencer be instructed on how to

18  weigh any particular fact in the capital sentencing decision. *See Tuilaepa v. California*, 512

19  U.S. 967, 979-80 (1994). The sentencer has broad discretion to determine whether death is

20  appropriate once a defendant is found eligible for the death penalty. *Id.* The Constitution

21  does not require that a specific weight be given to any particular mitigating factor, *see Harris*

22  *v. Alabama*, 513 U.S. 504, 512 (1995); nor must a death penalty statute enunciate specific

23  standards to guide the sentencer's consideration of aggravating and mitigating circumstances.

24  *See Tuilaepa*, 512 U.S. at 979-80; *see also Smith v. Stewart,* 140 F.3d 1263, 1272 (9th Cir.

25  1998) (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty

26  statute). The Arizona Supreme Court's rejection of this claim, *Djerf*, 191 Ariz. at 595-599,

27  959 P.2d at 1286-1290, was neither contrary to nor an unreasonable application of clearly

28

1    established federal law.  Petitioner is not entitled to relief on Claim Eight.

2            **Claim Nine**

3            Petitioner alleges that the state courts did not properly apply A.R.S. § 13-703(F)(6)

4    for the murders of Albert Luna, Damien Luna, Rochelle Luna, or Patricia Luna.  (Dkt. 55 at

5    84-93.)  He contends that there is insufficient evidence to support the (F)(6) aggravating

6    circumstance in his case.  (*Id.*)

7            A finding of either cruelty or heinousness/depravity will suffice to establish this

8    factor.  *See, e.g., State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996).  The

9    Arizona Supreme Court concluded that all four murders were especially cruel.  Because the

10   cruelty prong was established, the court did not reach the question of whether the murders

11   were committed with a heinous or depraved mental state.  *See Djerf*, 191 Ariz. at 597, 959

12   P.2d at 1288.

13           <u>Analysis</u>

14           With respect to the cruelty prong of (F)(6), Petitioner challenges only the finding

15   regarding Patricia Luna.  (Dkt. 55 at 84-93.)  The Arizona Supreme Court held that the

16   murder was especially cruel based on the following:

17           [Patricia] feared for her life and was uncertain as to her fate for hours.  She
         was forced to watch defendant stab and shoot her husband to death and to hear
18       defendant tell her he had murdered her daughter. Clearly, Patricia Luna's
         murder was especially cruel.
19
20   *Djerf*, 191 Ariz. at 596, 959 P.2d at 1287.

21           Whether a state court correctly applied an aggravating factor to the facts is a question

22   of state law, and federal habeas review is limited to determining whether the state court's

23   finding was so arbitrary or capricious as to constitute an independent due process or Eighth

24   Amendment violation.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  A state court's finding

25   of an aggravating factor is arbitrary or capricious only if no reasonable sentencer could have

26   so concluded.  *Id*. at 783.  The question is "whether, after viewing the evidence in the light

27   most favorable to the prosecution, any rational trier of fact" could have made the finding

28

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A habeas court faced with a record of historical facts which supports conflicting inferences must presume that the trier of fact resolved any such conflicts in favor of the prosecution. *Id.* at 326.

Under Arizona law, cruelty is established when the victim consciously suffers physical pain or emotional distress. *See State v. Bible*, 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993); *see also State v. Beaty*, 158 Ariz. 232, 242, 762 P.2d 519, 529 (1988). The Arizona Supreme Court found that all four murders were especially cruel. *Djerf*, 191 Ariz. at 588-89, 596, 959 P.2d at 1279-80, 1287. This Court agrees with the Arizona Supreme Court that Petitioner murdered Patricia Luna with especial cruelty. She suffered physically and mentally for hours, uncertain of her fate. Petitioner tormented her, killing her husband as she watched and telling her how her daughter died and how she and her son would die. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have made the cruelty finding beyond a reasonable doubt. The Arizona Supreme Court's decision was not an unreasonable application of clearly established federal law.

Next, Petitioner argues that the trial court erred in determining that all four murders were committed in a heinous or depraved manner. Despite Petitioner's attack upon the trial court, the relevant state court decision under habeas review is the last reasoned state decision regarding a claim. *See Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991)). The Arizona Supreme Court rendered the last state court decision on the merits of this issue. The court did not reach the question of whether the murders were committed in a heinous or depraved manner because it had already concluded that all four murders were committed in a especially cruel manner and because such a finding alone established the (F)(6) aggravating circumstance. *See Djerf*, 191 Ariz. at 597, 959 P.2d at 1288. A state's construction of its own law is binding on the federal court. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). The standard for establishing an aggravating circumstance is a state-law question. *See Jeffers*, 497 U.S. at 780. Petitioner is not entitled to relief on Claim Nine.

1

**Claim Ten**

2      Petitioner challenges the state courts' conclusion that the pecuniary gain aggravating

3 circumstance was satisfied.  He contends that there was insufficient evidence to show that

4 the murders were committed for pecuniary gain under A.R.S. § 13-703(F)(5). (Dkt. 55 at 93-

5 94.)

6      A finding that a murder was motivated by pecuniary gain for purposes of § 13-

7 703(F)(5) must be supported by evidence that pecuniary gain was the impetus, not merely

8 the result, of the murder.  *See Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir. 2005);

9 *see also State v. Cañez*, 202 Ariz. 133, 159, 42 P.3d 564, 590 (2002) (killing the victim and

10 sole witness of a robbery is powerful circumstantial evidence of an intent to facilitate escape

11 or hinder detection and providing sufficient evidence that the catalyst for the robbery was

12 pecuniary gain).  Killing for the purpose of financial gain is sufficient to establish the

13 aggravator.  *See State v. Walton*, 159 Ariz. 571, 588 (1989).  When a robber executes victims

14 to facilitate his escape and hinder detection, so as to successfully take and keep the stolen

15 items, he furthers his pecuniary gain motive.  *See id.*

16      On direct review of this claim, the Arizona Supreme Court rejected Petitioner's

17 argument that pecuniary gain did not motivate the murders:

18      [A]fter gaining entry to the Luna home, defendant immediately forced Patricia
       to place items of personal property into the family car. Then, after fleeing the
19      scene in the car, defendant removed and kept those items before leaving the
       car in the parking lot. The trial court correctly found that the state had proved
20      beyond a reasonable doubt that the (F)(5) aggravating factor of pecuniary gain
       exists.
21

22 *Djerf*, 191 Ariz. at 597, 959 P.2d at 1288.

23      Viewing the evidence in the light most favorable to the prosecution, a rational trier

24 of fact could have made the pecuniary gain finding beyond a reasonable doubt.  The Arizona

25 Supreme Court's finding upholding the aggravating circumstance was not arbitrary or

26 capricious so as to constitute an independent due process or Eighth Amendment violation.

27 Because the Arizona Supreme Court's decision was not an unreasonable application of

28

1   clearly established federal law, Petitioner is not entitled to relief for Claim Ten.

2          **Claim Eleven**

3          Petitioner alleges that the state courts failed to properly consider and weigh the

4   mitigating evidence he presented regarding his cooperative post-arrest conduct, troubled

5   family background, adjustment to confinement, and remorse.   (Dkt. 55 at 94-97.)

6   Respondents agree that part of Claim Eleven is exhausted but contend that Petitioner did not

7   exhaust his allegations  regarding post-arrest conduct and adjustment to confinement.  (Dkt.

8   66 at 43.)  Petitioner concedes this point but argues that these aspects of the claim were

9   exhausted by the Arizona Supreme Court's independent review of his death sentence. (Dkt.

10  72 at 49.)

11         The Arizona Supreme Court independently reviews each capital appeal to determine

12  whether the death sentence was properly imposed.  In *State v. Gretzler*, 135 Ariz. 42, 54, 659

13  P.2d 1, 13 (1983), the court stated that the purpose of independent review is to assess the

14  presence or absence of aggravating and mitigating circumstances and the weight to give to

15  each.  *See State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982).  To ensure

16  compliance with Arizona's death penalty statute, the court reviews the record regarding

17  aggravation and mitigation findings, and then decides independently whether the death

18  sentence should be imposed.  *See State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-

19  91 (1992).  In conducting its review, the court also determines whether the sentence of death

20  was imposed under the influence of passion, prejudice, or any other arbitrary factors.  *See*

21  *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *sentence overturned on other*

22  *grounds*, *Richmond v. Cardwell*, 450 F. Supp. 519 (D. Ariz. 1978).

23         Arguably, such a review rests on both state and federal grounds.  *See Brewer*, 170

24  Ariz. at 493, 826 P.2d at 790 (statutory duty to review death sentences arises from need to

25  ensure compliance with constitutional safeguards imposed by the Eighth and Fourteenth

26  amendments); *State v. Watson*, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981) (discussing *Gregg*

27  *v. Georgia*, 428 U.S. 153 (1976) and *Godfrey v. Georgia*, 446 U.S. 420 (1980), and stating

28

1   that independent review of death penalty is one method a state may utilize to prevent

2   arbitrary and capricious application of the death penalty).

3        While the Arizona Supreme Court's independent review does not encompass any and

4   all alleged constitutional error at sentencing, the Court finds that it did encompass

5   Petitioner's claim that the trial court violated the Eighth and Fourteenth Amendments by

6   failing to consider all proffered mitigating evidence. *See Watson*, 129 Ariz. at 63-64, 628

7   P.2d at 946-47 (citing *Godfrey* as support for decision to overturn death sentence based on

8   an independent re-weighing of aggravating and mitigating factors). In this case, the Arizona

9   Supreme Court conducted an independent review of the trial record, weighed all the

10   aggravating and mitigating factors, and concluded that the trial court did not err in its

11   imposition of the death penalty. *Djerf*, 191 Ariz. at 595, 959 P.2d at 1286. The state

12   supreme court's review of the trial court's consideration of the mitigating evidence

13   sufficiently exhausted Claim Eleven. Therefore, the Court will review Claim Eleven in its

14   entirety.

15        Regarding the allegations exhausted by independent review, when a state court

16   decides the merits of a claim without providing its rationale, under the AEDPA the habeas

17   court independently reviews the record to assess whether the state court decision was

18   objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853. Although

19   the state court record is reviewed independently, the habeas court nevertheless defers to the

20   state court's ultimate decision. *Pirtle*, 313 F.3d at 1167. Further, 28 U.S.C. § 2254(e)(1)

21   requires federal habeas courts to presume the correctness of a state court's factual findings

22   unless the petitioner rebuts this presumption with "clear and convincing evidence." *See*

23   *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007).

24       <u>Legal Standards</u>

25        In capital sentencing proceedings, the sentencer must not be precluded from

26   considering relevant mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586 (1978). In

27   *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held that under

28

- 37 -

the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigation information, "it is free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence").

On habeas review, the federal court does not evaluate the substance of each piece of evidence submitted as mitigation; rather, it reviews the state court record to ensure that the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of such evidence). Thus, "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" *Moormann*, 426 F.3d at 1055 (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (the sentencing court properly considered all information, including nonstatutory mitigation, where the court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998).

Although the sentencer may not refuse to consider constitutionally relevant mitigating evidence, it is constitutionally permissible for a state death penalty statute to impose on defendants the burden of establishing the existence of a mitigating circumstance by a preponderance of the evidence. *See Walton*, 497 U.S. at 649-51 (plurality opinion); *see also Delo v. Lashley*, 507 U.S. 272, 275 (1993) (per curiam) (stating that "we recently made clear

that a State may require the defendant to bear the risk of nonpersuasion as to the existence of mitigating circumstances") (other citation omitted).  In a weighing state like Arizona, if the sentencer determines that a mitigating circumstance has been established by a preponderance of the evidence, the Eighth and Fourteenth Amendments further require that such evidence be given whatever effect, or weight, the sentencer deems appropriate.  *See Richmond v Lewis*, 506 U.S. 40, 47-48 (1992); *see also Johnson v. Texas*, 509 U.S. 350, 367 (1993) (sentencer must be able to give effect to relevant mitigation that has been established by the evidence).  However, the Constitution does not require that a death penalty statute assign a specific weight to any particular mitigating factor established at sentencing.  *See Harris v. Alabama*, 513 U.S. 504, 512 (1995).  The *Harris* Court held that requiring states to assign particular weight to mitigation would "place within constitutional ambit micromanagement tasks that properly rest within the [s]tate's discretion to administer its criminal justice system."  *Id.*  Thus, it is an issue of state law whether a mitigating circumstance exists and, if established, the weight to be assigned to it.  *See Ortiz*, 149 F.3d at 943; *see also Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006) (once mitigation is allowed in, a finding that there are no mitigating circumstances does not violate the Constitution).

       <ins>Merits</ins>

       Petitioner contends that the state courts failed to properly consider and give effect to the following non-statutory mitigation circumstances presented at sentencing: (1) cooperative post-arrest conduct, (2) a troubled family background, (3) adjustment to confinement, and (4) remorse.  (Dkt. 55 at 94-97.)

       *Independent Review of the State Court Sentencing Record*

       At sentencing, the trial court found three aggravating circumstances for three of the murders and four aggravating circumstances for the fourth murder.  (RT 5/22/96 at 8-17; ROA 274.)  The court then made findings with respect to statutory and nonstatutory mitigating factors.  (RT 5/22/96 at 19-23.)  The court found that Petitioner had not proved

any of the statutory mitigating factors. (*Id.* at 17-19.)  Regarding non-statutory mitigation, the court indicated that it had considered all aspects of the Petitioner's character, propensities, or record and any of the circumstances of the offense to determine whether there were mitigating circumstances sufficiently substantial to call for leniency. (*Id.* at 19.) In its consideration of mitigation, the court indicated that it had reviewed the change of plea proceedings, the file, the arguments of counsel regarding mitigation findings, Petitioner's sentencing memorandum, the testimony presented at the sentencing hearings, and Petitioner's interview conducted by his attorney. (*Id.* at 3, 19.)  In his sentencing memorandum and at the sentencing hearings, Petitioner argued and presented testimony in support of mitigation. (ROA 269; RT 2/9/96; RT 5/10/96.)

At sentencing, the trial court found that Petitioner's post-arrest conduct was not a mitigating circumstance, because Petitioner had no place to go and his friends were talking to the police.  Consequently, his compliance with the arresting officers was not a mitigating circumstance. (RT 5/22/96 at 20.)  Next, the court found that there was no evidence that Petitioner's alleged difficult family background had any effect upon his behavior during the killings that was beyond his control. (*Id.*)  Next, the court found that while Petitioner had adjusted to confinement, he was not a model inmate; he had several disciplinary write-ups for jail infractions. (*Id.* at 21.)  Finally, the court found that Petitioner was not remorseful, blaming Albert Luna, Jr., for the murders. (*Id.* at 20-21.)  Petitioner also told a reporter that under the right circumstances he could kill again. (*Id.*)  The court found that Petitioner's guilty plea was a tactical decision made in the face of overwhelming evidence of guilt. (*Id.* at 21.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that the trial court failed to consider and give effect to his mitigation evidence. *Djerf*, 191 Ariz. at 595, 597-99, 959 P.2d at 1286, 1288-90.  The supreme court addressed Petitioner's arguments related to difficult family background and remorse:

Defendant claims that the trial court erred in refusing to give weight to

- 40 -

a stressful family background and that not doing so violates the directive in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that the trial judge must consider all mitigating evidence proffered by defendant. This court has held that *Lockett* and *Eddings* require only that the sentencer consider evidence proffered for mitigation. *State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995), *cert. denied*, 516 U.S. 1052, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996). The sentencer, however, is entitled to give it the weight it deserves. *Id.* Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. *Ross*, 180 Ariz. at 607, 886 P.2d at 1362. The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that his family background had any effect on the crimes.

Defendant introduced evidence that he was separated from his mother at a young age and raised by a father who was cold and aloof. Defendant insisted, however, that he was not physically abused by his father, and no evidence was introduced to show otherwise. We conclude that defendant's family background, in light of the entire record, will not mitigate the death sentences imposed for these murders.

. . . .

A sense of remorse may be a mitigating circumstance. *Brewer*, 170 Ariz. at 507, 826 P.2d at 804. Defendant claims that, because his guilty pleas were an effort to spare the feelings of the remaining members of the Luna family and because statements in letters he wrote allegedly demonstrated remorse for the killings, the trial court erred in concluding that defendant felt no remorse.

On this record, we conclude that defendant has not proven remorse by a preponderance of the evidence. First, the evidence does not support defendant's contention that his guilty pleas were meant to spare the remaining members of the Luna family. Rather, as the trial court's special verdict correctly notes, the guilty pleas were a "tactical decision made in the face of overwhelming guilt."

Second, it is true that while in jail defendant wrote to friends that the Luna family "did not deserve that" and that he did not deserve to live. This argument is contradicted, however, by defendant's attempt to place the blame for the murders on his girlfriend, on the Glendale police, and on Albert Luna, Jr. Defendant also told the reporter that "under the right circumstance, he could kill again."

*Djerf*, 191 Ariz. at 598, 959 P.2d at 1289.

*Discussion*

The state courts carried out their constitutional obligation to consider all of the evidence offered in mitigation, including the non-statutory mitigation cited in Claim Eleven.

- 41 -

As discussed above, the trial court made specific on-the-record findings with respect to these four factors. (ROA 274; RT 5/22/96 at 20.) The trial court stated that it had considered all of the mitigation arguments and evidence presented in Petitioner's sentencing memorandum and at the sentencing hearings. (ROA 269; RT 2/9/96; RT 5/10/96.) Thus, the trial court considered all of Petitioner's arguments and evidence in support of mitigation, including all the non-statutory mitigation which comprises Claim Eleven. The trial court simply disagreed with Petitioner regarding the import of such mitigation. However, the fact that the sentencing court in this case found the evidence inadequate to justify leniency, does not violate the Constitution. *See Ortiz*, 149 F.3d at 943; *see also Eddings*, 455 at 114-15. After independent review, the Court concludes that the trial court considered all of the mitigation evidence presented by Petitioner, thereby fulfilling the directive set forth in *Lockett* and *Eddings*. *See Parker*, 498 U.S. at 318.

On direct appeal, Petitioner specifically challenged the trial court's findings regarding difficult family history and remorse. (*See* Opening Br. at 35-36.) The Arizona Supreme Court addressed Petitioner's arguments and considered Petitioner's mitigation regarding difficult family history and remorse. *Djerf*, 191 Ariz. at 598, 959 P.2d at 1289. Furthermore, on direct appeal, the Arizona Supreme Court specifically stated that they independently considered the complete record of mitigation evidence Petitioner presented during sentencing before concluding that it was not sufficient to warrant leniency. *Djerf*, 191 Ariz. at 595, 598-99, 959 P.2d at 1286, 1289-90. Thus, the Court concludes that the Arizona Supreme Court properly considered all of the mitigation evidence presented by Petitioner at sentencing, thereby fulfilling the directive set forth in *Lockett* and *Eddings*. *See Parker*, 498 U.S. at 318. The supreme court's decision that Petitioner's mitigation record was insufficient to warrant leniency is not contrary to or an unreasonable application of clearly established federal law.

Finally, Petitioner argues that *Tennard v. Dretke*, 542 U.S. 274 (2004), supports his contention that the trial court failed to properly consider his non-statutory mitigation evidence. (Dkt. 72 at 49-50.) In *Tennard*, the Court reiterated the general principle that it

1    is not enough simply to allow the defendant to present mitigating evidence, the sentencer

2    must be able to consider and give effect to that evidence.  542 U.S. at 283.  The *Tennard*

3    Court ruled that mitigation evidence may not be made to pass through a threshold screening

4    test before it is available for consideration as mitigation by the sentencer.  *Id.*  The Court

5    struck down a standard that kept certain mitigation evidence from consideration.  *Id.* at 287-

6    88 (the threshold screening test at issue required both a uniquely severe permanent handicap

7    and a causal nexus between the criminal act and the severe permanent condition before the

8    mitigation could be considered).

9        Petitioner does not identify the non-statutory mitigation evidence to which his

10    *Tennard* argument is directed. (Dkt. 72 at 49-53.) Nonetheless, it is readily apparent that the

11    trial court and the Arizona Supreme Court performed their constitutional duty and properly

12    considered the mitigating evidence, even citing *Lockett* and *Eddings*.[10]  *See Djerf*, 191 Ariz.

13    at 595, 597-99, 959 P.2d at 1286, 1288-90; *See* RT 5/22/96.  The fact that the state courts

14    found the non-statutory mitigation evidence inadequate to warrant leniency does not violate

15    the Constitution.  *See Ortiz*, 149 F.3d at 943; *see also Williams*, 441 F.3d at 1057.  The trial

16    court and the Arizona Supreme Court properly considered Petitioner's non-statutory

17    mitigation evidence.  Petitioner is not entitled to relief on Claim Eleven.

18        **Claim Thirteen**

19        Petitioner alleges that he was entitled to a jury determination on the aggravating

20    factors that rendered him eligible for a death sentence. (Dkt. 55 at 108.) In *Ring v. Arizona*,

21

22        [10]     In its discussion of mitigating information concerning Petitioner's difficult
family background, the supreme court, after discussing the mandate of *Lockett* and *Eddings*,

23    clarified that consideration of mitigation is separate and apart from whether a court is
required to give any weight to the mitigation evidence. *See Djerf*, 191 Ariz. at 598, 959 P.2d

24    at 1289.  Following this discussion, the court summarized the trial court's treatment of the

25    mitigation evidence, stating that the trial court had considered the evidence but declined to
give it weight, finding it "irrelevant." *Id.*  The Court does not construe this comment to mean

26    that the trial court was precluded from considering, or refused to consider, the proffered

27    mitigation.  Rather, use of the term "irrelevant" indicates that the mitigation was found
insufficient to warrant leniency.

28

536 U.S. 584 (2002), the Supreme Court ruled that Arizona's aggravating factors are an element of the offense of capital murder and must be found by a jury.  However, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Supreme Court held that *Ring* does not apply retroactively to cases, like Petitioner's, already final on direct review.  Petitioner concedes that pursuant to *Summerlin*, he is not entitled to relief.  (Dkt. 72 at 55.)

**Claim Fourteen**

Petitioner challenges the constitutionality of Arizona's statutory scheme for imposing the death penalty.  (Dkt. 55 at 109-114.)  Petitioner alleges that the death penalty statute establishes a presumption in favor of death because a death sentence is imposed if the aggravating circumstances outweigh the mitigation presented.  (*Id.*)  He also contends that Arizona's system of utilizing aggravating factors is unconstitutionally broad because the factors do not genuinely narrow the class of murderers who may be subject to the death penalty.  (*Id.*)  Respondents concede that this claim is properly exhausted.  (Dkt. 66 at 49.)

It is unclear why Respondents concede exhaustion of this claim because the PCR court found it procedurally defaulted.  (*See* ROA-PCR 27; *Franklin v. Johnson*, 290 F.3d 1223, 1230 (9th Cir. 2002) ("A claim is procedurally defaulted if the state court declined to address the issue on the merits for procedural reasons.")  Nevertheless, regardless of exhaustion, this claim is without merit.  *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277 (2005).

In *Walton*, the Supreme Court rejected the argument that Arizona's death penalty statute is impermissibly mandatory or that it creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. 497 U.S. at 651-52 (relying on *Blystone v. Pennsylvania,* 494 U.S. 299 (1990), and *Boyde v. California,* 494 U.S. 370 (1990)).  The Court held that Arizona's death penalty statute provides for discretion through individualized sentencing where the sentencer considers all relevant mitigation that bears on the circumstances of the crime and on the defendant.  *Id.*; *see also Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 2524 (2006)

1  (relying on *Walton* to uphold Kansas's death penalty statute, which imposed the death

2  penalty when the established mitigation did not outweigh the aggravating circumstances).

3  Petitioner is not entitled to relief on Claim Fourteen.

4       **Claim Fifteen**

5       Petitioner contends that Arizona's death penalty statute is unconstitutional because

6  its application arbitrarily and capriciously discriminates against young male indigent

7  defendants. (Dkt. 55 at 114.) Respondents argue that Petitioner procedurally defaulted this

8  claim in state court. (Dkt. 66 at 51.) Petitioner responds that the Arizona Supreme Court's

9  independent sentencing review exhausted this claim. However, this is not the type of claim

10  exhausted by the supreme court's independent sentencing review. *See Moormann*, 426 F.3d

11  at 1057-58.

12       Petitioner presented this claim during PCR proceedings, but the PCR court concluded

13  it was procedurally defaulted as waived pursuant to Ariz. R. Crim. P. 32.2(a)(3), indicating

14  it should have been raised on direct appeal. (ROA-PCR 27.) Rule 32.2(a)(3) was an

15  adequate procedural bar at the time of Petitioner's procedural default of Claim Fifteen;

16  Arizona's procedural bar for waived claims is firmly established and regularly followed. *See,*

17  *e.g., Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998) (citing cases). Because the

18  procedural bar is adequate and independent, federal review of this claim is foreclosed unless

19  Petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.

20       Petitioner asserts ineffective assistance of appellate counsel as cause to excuse the

21  default. (Dkt. 72 at 57.) Before ineffective assistance of appellate counsel may be utilized

22  as cause to excuse a procedural default, the particular IAC allegation must first be exhausted

23  before the state courts as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446,

24  451-53 (2000); *Murray v. Carrier*, 477 U.S. at 489-90; *Tacho v. Martinez*, 862 F.2d 1376,

25  1381 (9th Cir. 1988). During PCR proceedings, Petitioner did not fairly present any

26  appellate IAC claims based on counsel's failure to raise this claim on appeal. (ROA-PCR

27  27.) Therefore, appellate IAC cannot constitute cause. Because Petitioner has failed to

28

1   establish cause, there is no need to address prejudice.  Petitioner does not attempt to

2   demonstrate that a fundamental miscarriage of justice will occur if this claim is not resolved

3   on the merits.  Therefore, Claim Fifteen is procedurally barred.

4          **Claim Sixteen**

5          Petitioner contends that Arizona's death penalty statute is unconstitutional because

6   it allows State prosecutors unbridled discretion to determine whether to pursue the death

7   penalty. Petitioner concedes that he that he did not properly exhaust this claim to the Arizona

8   Supreme Court. (Dkt. 55 at 116; Dkt. 66 at 51.)  A writ of habeas corpus may not be granted

9   unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C.

10  § 2254(b)(1); *see also Coleman*, 501 U.S. at 731.  To exhaust state remedies, a petitioner

11  must "fairly present" the operative facts and the federal legal theory of his claims to the

12  state's highest court in a procedurally appropriate manner.  *See O'Sullivan*, 526 U.S. at 848.

13         Petitioner contends that the Arizona Supreme Court's independent sentencing review

14  exhausted Claim 16.  (Dkt. 72 at 57.)  Again, this is not the type of claim exhausted by the

15  supreme court's independent sentencing review.  *See Moormann*, 426 F.3d at 1057-58.

16  Petitioner failed to properly exhaust this claim in state court.  If Petitioner were to return to

17  state court now and attempt to litigate this claim, it would be found waived and untimely

18  under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it

19  does not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).

20  Therefore, Claim Sixteen is  "technically" exhausted but procedurally defaulted because

21  Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.

22  Claim Sixteen will not be considered on the merits absent a showing of cause and prejudice

23  or a fundamental miscarriage of justice, none of which Petitioner attempts to demonstrate.

24  Claim Sixteen is denied.

25         **Claim Seventeen**

26         Petitioner alleges his constitutional rights will be violated because he will not receive

27  a fair clemency proceeding.  In particular, he alleges the proceeding will not be fair and

28

1   impartial based on the Board's selection process, composition, training, and procedures, and

2   because the Attorney General will act as the Clemency Board's legal advisor and as an

3   advocate against Petitioner.  (Dkt. 55 at 117-121.)

4          Petitioner acknowledges that because he has not sought clemency this claim is

5   premature and not ripe for adjudication.  More significantly, however, this claim is not

6   cognizable on federal habeas review.  Habeas relief can only be granted on a claim that a

7   prisoner "is in custody in violation of the Constitution or laws or treaties of the United

8   States." 28 U.S.C. § 2254(a).  Petitioner's challenge to state clemency procedures does not

9   constitute an attack on his detention (i.e., his conviction or sentence) and thus is not a proper

10  grounds for habeas relief.  *See Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989); *see also*

11  *Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are

12  not cognizable under federal habeas law).  Therefore, Claim Seventeen is dismissed as not

13  cognizable.

14         **Claim Eighteen**

15         Claim Eighteen alleges that Petitioner will be incompetent to be executed under the

16  Sixth, Eighth, and Fourteenth Amendments, and *Ford v. Wainwright*, 477 U.S. 399 (1986).

17  (Dkt. 55 at 121-23.)  Petitioner recognizes that this claim is not yet ripe for federal review.

18  (Dkt. 66 at 53-54.)  Pursuant to *Martinez-Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir.

19  1997), *aff'd*, 523 U.S. 637 (1998), a claim of incompetency for execution had to "be raised

20  in a first habeas petition, whereupon it also must be dismissed as premature due to the

21  automatic stay that issues when a first petition is filed."  The Supreme Court revisited

22  *Martinez-Villareal* and concluded in *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007), that it

23  is unnecessary to raise unripe *Ford* claims in the initial habeas petition in order to preserve

24  any possible unripe incompetency claim.  *Id.* at 2854.  Thus, if this claim becomes ripe for

25  review, it may be presented to the district court; it will not be treated as a second or

26  successive petition.  *See id*. at 2854-55.  Therefore, the Court dismisses Claim Eighteen

27  without prejudice as premature.

28

1    **Claim Nineteen**

2        Petitioner alleges that execution after an extended period of incarceration on death

3    row fails to serve any legitimate penological purpose and violates his Eighth Amendment

4    right to be free from cruel and unusual punishment. (Dkt. 55 at 123-33.) Petitioner concedes

5    he did not present this claim to the state courts but argues it could not be raised in state court

6    because of an absence of available state corrective process. (*Id.* at 123.)   Regardless of

7    exhaustion, the Court will deny Claim Nineteen as plainly meritless.   *See* 28 U.S.C. §

8    2254(b)(2); *Rhines*, 544 U.S. at 277.

9        The Supreme Court has not held that lengthy incarceration prior to execution

10   constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995)

11   (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not

12   been addressed).   Circuit courts, including the Ninth Circuit, have held that prolonged

13   incarceration under a sentence of death does not offend the Eighth Amendment.   *See*

14   *McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79

15   F.3d 432, 438 (5th Cir. 1996) (delay of 17 years); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th

16   Cir. 1995) (delay of 15 years).   Accordingly, Petitioner cannot establish a right to federal

17   habeas relief. *See Allen v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006).

18                              **CONCLUSION**

19       The Court finds that Petitioner has failed to establish entitlement to habeas relief on

20   any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither

21   warranted nor required.[11]  Therefore, Petitioner's First Amended Petition for Writ of Habeas

22   Corpus is denied and judgment will be entered accordingly.

23                      **CERTIFICATE OF APPEALABILITY**

24       In the event Petitioner appeals from this Court's judgment, and in the interests of

25

26       [11]  The Court previously denied Petitioner's request for evidentiary development as
27   to specific claims (Dkt. 94), but conducted an independent review as to all the claims as
     required by Rule 8 of the Rules Governing Section 2254 Cases.
28

conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution Claim Four. For the remaining claims, the Court declines to issue a COA for the reasons set forth in the instant Order and this Court's previous Order. (Dkt. 94.)

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's First Amended Petition for Writ of Habeas Corpus (Dkt. 55) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on March 1, 2002, is **VACATED**. (Dkt. 3.)

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issue: Whether the Court erred in determining that Claim Four, alleging IAC

1  of counsel at sentencing based on counsel's failure to investigate and present mitigation

2  information regarding his dysfunctional family background and mental health, is without

3  merit.

4        **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

5  Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington,

6  Phoenix, Arizona 85007-3329.

7        DATED this 29th day of September, 2008.

8

9

10

11  _____

12          James A. Teilborg
       United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28